Opinion for the Court filed by Circuit Judge TATEL.
Dissenting opinion filed by Senior Circuit Judge WILLIAMS.
TATEL, Circuit Judge:
In Northwest Austin Municipal Utility District No. One v. Holder, 557 U.S. 193, 129 S.Ct. 2504, 174 L.Ed.2d 140 (2009), the Supreme Court raised serious questions about the continued constitutionality of section 5 of the Voting Rights Act of 1965. Section 5 prohibits certain “covered jurisdictions” from making any change in their voting procedures without first demon *853 strating to either the Attorney General or a three-judge district court in Washington that the change “neither has the purpose nor mil have the effect of denying or abridging the right to vote on account of race or color.” 42 U.S.C. § 1973c(a). The Supreme Court warned that the burdens imposed by section 5 may no longer be justified by current needs and that its geographic coverage may no longer sufficiently relate to the problem it targets. Although the Court had no occasion to resolve these questions, they are now squarely before us. Shelby County, Alabama, a covered jurisdiction, contends that when Congress reauthorized section 5 in 2006, it exceeded its enumerated powers. The district court disagreed and granted summary judgment for the Attorney General. For the reasons set forth in this opinion, we affirm.
I.
The Framers of our Constitution sought to construct a federal government powerful enough to function effectively yet limited enough to preserve the hard-earned liberty fought for in the War of Independence. They feared not state government, but centralized national government, long the hallmark of Old World monarchies. As a result, “[t]he powers delegated by the ... Constitution to the federal government, are few and defined,” while “[tjhose which are to remain in the State governments are numerous and indefinite.” The Federalist No. 45 (James Madison). Close to the people, state governments would protect their liberties.
But the experience of the nascent Republic, divided by slavery, taught that states too could threaten individual liberty. So after the Civil War, the Reconstruction Amendments were added to the Constitution to limit state power. Adopted in 1865, the Thirteenth Amendment prohibited involuntary servitude. Adopted three years later, the Fourteenth Amendment prohibited any state from “depriving] any person of life, liberty, or property, without due process of law” or “deny[ing] to any person within its jurisdiction the equal protection of the laws,” and granted Congress “power to enforce” its provisions “by appropriate legislation.” U.S. Const, amend. XIV. Finally, the Fifteenth Amendment declared that “[t]he right of citizens ... to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude” and vested Congress with “power to enforce this article by appropriate legislation.” U.S. Const, amend. XV.
Following Reconstruction, however, “the blight of racial discrimination in voting ... infected the electoral process in parts of our country for nearly a century.” South Carolina v. Katzenbach, 383 U.S. 301, 308, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). As early as 1890, “the States of Alabama, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and Virginia” began employing tests and devices “specifically designed to prevent Negroes from voting.” Id. at 310, 86 S.Ct. 803. Among the most notorious devices were poll taxes, literacy tests, grandfather clauses, and property qualifications. See Shelby Cnty. v. Holder, 811 F.Supp.2d 424, 428 (D.D.C.2011); see also Katzenbach, 383 U.S. at 310-11, 86 S.Ct. 803. Also widely employed, both immediately following Reconstruction and again in the mid-twentieth century, were “laws designed to dilute black voting strength,” including laws that “gerrymandered election districts, instituted at-large elections, annexed or deannexed land ... and required huge bonds of officeholders.” Shelby Cnty., 811 F.Supp.2d at 429 (internal quotation marks omitted).
The courts and Congress eventually responded. The Supreme Court struck *854 down grandfather clauses, Guinn v. United States, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 (1915), and white primaries, Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944). Congress “enact[ed] civil rights legislation in 1957, 1960, and 1964, which sought to ‘facilitat[e] case-by-case litigation against voting discrimination.’” Shelby Cnty., 811 F.Supp.2d at 430 (alteration in original) (quoting Katzenbach, 383 U.S. at 313, 86 S.Ct. 803). But Congress soon determined that such measures were inadequate: case-by-case litigation, in addition to being expensive, was slow—slow to come to a result and slow to respond once a state switched from one discriminatory device to the next—and thus had “done little to cure the problem of voting discrimination.” Katzenbach, 383 U.S. at 313, 86 S.Ct. 803. Determined to “rid the country of racial discrimination in voting,” id. at 315, 86 S.Ct. 803, Congress passed the Voting Rights Act of 1965.
Unlike prior legislation, the 1965 Act combined a permanent, case-by-case enforcement mechanism with a set of more stringent, temporary remedies designed to target those areas of the country where racial discrimination in voting was concentrated. Section 2, the Act’s main permanent provision, forbids any “standard, practice, or procedure” that “results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color.” 42 U.S.C. § 1973(a). Applicable nationwide, section 2 enables individuals to bring suit against any state or jurisdiction to challenge voting practices that have a discriminatory purpose or result. See Thornburg v. Gingles, 478 U.S. 30, 35, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).
Reaching beyond case-by-ease litigation and applying only in certain “covered jurisdictions,” section 5—the focus of this litigation—“prescribes remedies ... which go into effect without any need for prior adjudication.” Katzenbach, 383 U.S. at 327-28, 86 S.Ct. 803. Section 5 suspends “all changes in state election procedure until they [are] submitted to and approved by a three-judge Federal District Court in Washington, D.C., or the Attorney General.” Nw. Austin, 129 S.Ct. at 2509. A jurisdiction seeking to change its voting laws or procedures must either submit the change to the Attorney General or seek preclearance directly from the three-judge court. If it opts for the former and if the Attorney General lodges no objection within sixty days, the proposed law can take effect. 42 U.S.C. § 1973c(a). But if the Attorney General lodges an objection, the submitting jurisdiction may either request reconsideration, 28 C.F.R. § 51.45(a), or seek a de novo determination from the three-judge district court. 42 U.S.C. § 1973c(a). Either way, preclearance may be granted only if the jurisdiction demonstrates that the proposed change to its voting law neither “has the purpose nor ... the effect of denying or abridging the right to vote on account of race or color.” Id.
Prior to section 5’s enactment, states could stay ahead of plaintiffs and courts “ ‘by passing new discriminatory voting laws as soon as the old ones had been struck down.’ ” Beer v. United States, 425 U.S. 130, 140, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976) (quoting H.R.Rep. No. 94-196, at 57-58 (1975)). But section 5 “shift[ed] the advantage of time and inertia from the perpetrators of the evil to its victim.” Katzenbach, 383 U.S. at 328, 86 S.Ct. 803. It did so by placing “the burden on covered jurisdictions to show their voting changes are nondiscriminatory before those changes can be put into effect.” Shelby Cnty., 811 F.Supp.2d at 431. Section 5 thus “pre-empted the most powerful tools of black disenfranchisement,” Nw. Austin, 129 S.Ct. at 2509, resulting in “un *855 deniable” improvements in the protection of minority voting rights, id. at 2511.
Section 4(b) contains a formula that, as originally enacted, applied section 5’s preclearance requirements to any state or political subdivision of a state that “maintained a voting test or device as of November 1, 1964, and had less than 50% voter registration or turnout in the 1964 presidential election.” Shelby Cnty., 811 F.Supp.2d at 432 (citing Voting Rights Act of 1965, Pub.L. No. 89-110, § 4(b), 79 Stat. 437, 438 (“1965 Act”)). Congress chose these criteria carefully. It knew precisely which states it sought to cover and crafted the criteria to capture those jurisdictions. Id. (citing testimony before Congress in 2005-2006). Unsurprisingly, then, the jurisdictions originally covered in their entirety, Alabama, Georgia, Louisiana, Mississippi, South Carolina, and Virginia, “were those southern states with the worst historical records of racial discrimination in voting.” Id.
Because section 4(b)’s formula could be both over- and underinclusive, Congress incorporated two procedures for adjusting coverage over time. First, as it existed in 1965, section 4(a) allowed jurisdictions to earn exemption from coverage by obtaining from a three-judge district court a declaratory judgment that in the previous five years (i.e., before they became subject to the Act) they had used no test or device “for the purpose or with the effect of denying or abridging the right to vote on account of race or color.” 1965 Act § 4(a). This “bailout” provision, as subsequently amended, addresses potential overinclusiveness, allowing jurisdictions with clean records to terminate their section 5 preclearance obligations. Second, section 3(c) authorizes federal courts to require preclearance by any non-covered state or political subdivision found to have violated the Fourteenth or Fifteenth Amendments. 42 U.S.C. § 1973a(e). Specifically, courts presiding over voting discrimination suits may “retain jurisdiction for such period as [they] may deem appropriate” and order that during that time no voting change take effect unless either approved by the court or unopposed by the Attorney General. Id. This judicial “bail-in” provision addresses the formula’s potential underinclusiveness.
As originally enacted in 1965, section 5 was to remain in effect for five years. In South Carolina v. Katzenbach, the Supreme Court sustained the constitutionality of section 5, holding that its provisions “are a valid means for carrying out the commands of the Fifteenth Amendment.” 383 U.S. at 337, 86 S.Ct. 803. Congress subsequently renewed the temporary provisions, including sections 4(b) and 5, in 1970 (for five years), then in 1975 (for seven years), and again in 1982 (for twenty-five years). In each version, “[t]he coverage formula [in section 4(b)] remained the same, based on the use of voting-eligibility tests [or devices] and the rate of registration and turnout among all voters, but the pertinent dates for assessing these criteria moved from 1964 to include 1968 and eventually 1972.” Nw. Austin, 129 S.Ct. at 2510. In 1975 Congress made one significant change to section 4(b)’s scope: it amended the definition of “test or device” to include the practice of providing only English-language voting materials in jurisdictions with significant non-English-speaking populations. Act of Aug. 6, 1975, Pub.L. No. 94-73, § 203, 89 Stat. 400, 401-02 (codified at 42 U.S.C. § 1973b(f)(3)). Although not altering the basic coverage formula, this change expanded section 4(b)’s scope to encompass jurisdictions with records of voting discrimination against “language minorities.” See Briscoe v. Bell, 432 U.S. 404, 405, 97 S.Ct. 2428, 53 L.Ed.2d 439 (1977). The Supreme Court sustained the constitutionality of each extension, respectively, in Geor *856 gia v. United States, 411 U.S. 526, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973), City of Rome v. United States, 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980), and Lopez v. Monterey County, 525 U.S. 266, 119 S.Ct. 693, 142 L.Ed.2d 728 (1999).
Significantly for the issue before us, the 1982 version of the Voting Rights Act made bailout substantially more permissive. Prior to 1982, bailout was extremely limited: no jurisdiction could bail out if it had used discriminatory voting tests or practices when it first became subject, to section 5, even if it had since eliminated those practices. Shelby Cnty., 811 F.Supp.2d at 434. By contrast, after 1982 the Act allowed bailout by any jurisdiction with a “clean” voting rights record over the previous ten years. Id. The 1982 reauthorization also permitted a greater number of jurisdictions to seek bailout. Previously, “only covered states (such as Alabama) or separately-covered political subdivisions (such as individual North Carolina counties) were eligible to seek bailout.” Id. After 1982, political subdivisions within a covered state could bail out even if the state as a whole was ineligible. Id.
Setting the stage for this litigation, Congress extended the Voting Rights Act for another twenty-five years in 2006. See Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Pub.L. No. 109-246, 120 Stat. 577 (“2006 Act”). In doing so, it acted on the basis of a legislative record “over 15,000 pages in length, and includ[ing] statistics, findings by courts and the Justice Department, and first-hand accounts of discrimination.” Shelby Cnty., 811 F.Supp.2d at 435 (internal quotation marks omitted). Congress also amended section 5 to overrule the Supreme Court’s decisions in Georgia v. Ashcroft, 539 U.S. 461, 479-80, 123 S.Ct. 2498, 156 L.Ed.2d 428 (2003) (which held that “any assessment of the retrogression of a minority group’s effective exercise of the electoral franchise depends on an examination of all the relevant circumstances” and that “a court should not focus solely on the comparative ability of a minority group to elect a candidate of its choice”), and Reno v. Bossier Parish School Board, 528 U.S. 320, 328, 120 S.Ct. 866, 145 L.Ed.2d 845 (2000) (“Bossier II”) (which held that “the ‘purpose’ prong of § 5 covers only retrogressive dilution”). See 2006 Act § 5 (codified at 42 U.S.C. § 1973c(b)-(d)).
The 2006 Act’s constitutionality was immediately challenged by “a small utility district” subject to its provisions. See Nw. Austin, 129 S.Ct. at 2508. After finding the district ineligible for bailout, the three-judge district court concluded that the reauthorized Voting Rights Act was constitutional. Nw. Austin Mun. Util. Dist. No. One v. Mukasey, 573 F.Supp.2d 221, 283 (D.D.C.2008). On appeal, the Supreme Court identified two “serious ... questions” about section 5’s continued constitutionality, namely, whether the “current burdens” it imposes are “justified by current needs,” and whether its “disparate geographic coverage is sufficiently related to the problem that it targets.” Nw. Austin, 129 S.Ct. at 2512-13. But invoking the constitutional avoidance doctrine, id. at 2508, 2513, the Court interpreted the statute to allow any covered jurisdiction, including the utility district bringing suit in that case, to seek bailout, thus avoiding the need to resolve the “big question,” id. at 2508: Did Congress exceed its constitutional authority when it reauthorized section 5? Now that question is squarely presented.
II.
Shelby County filed suit in the U.S. District Court for the District of Columbia, seeking both a declaratory judgment that *857 sections 4(b) and 5 of the Voting Rights Act are facially unconstitutional and a permanent injunction prohibiting the Attorney General from enforcing them. Shelby Cnty., 811 F.Supp.2d at 427. Unlike the utility district in Northwest Austin, Shelby County never sought bailout, and for good reason. Because the county had held several special elections under a law for which it failed to seek preclearance and because the Attorney General had recently objected to annexations and a redistricting plan proposed by a city within Shelby County, the County was clearly ineligible for bailout. See id. at 446 n. 6. As the district court — Judge John D. Bates — recognized, the “serious constitutional questions” raised in Northwest Austin could “no longer be avoided.” Id. at 427.
Addressing these questions in a thorough opinion, the district court upheld the constitutionality of the challenged provisions and granted summary judgment for the Attorney General. After reviewing the extensive legislative record and the arguments made by Shelby County, the Attorney General, and a group of defendant-intervenors, the district court concluded that “Section 5 remains a ‘congruent and proportional remedy’ to the 21st century problem of voting discrimination in covered jurisdictions.” Id. at 428. Responding to the Supreme Court’s concerns in Northwest Austin, the district court found the record evidence of contemporary discrimination in covered jurisdictions “plainly adequate to justify section 5’s strong remedial and preventative measures,” id. at 492 (internal quotation marks omitted), and to support Congress’s predictive judgment that failure to reauthorize section 5 “‘would leave minority citizens with the inadequate remedy of a Section 2 action,’” id. at 498 (quoting H.R.Rep. No. 109-478, at 57 (2006)). This evidence consisted of thousands of pages of testimony, reports, and data regarding racial disparities in voter registration, voter turnout, and electoral success; the nature and number of section 5 objections; judicial preclearance suits and section 5 enforcement actions; successful section 2 litigation; the use of “more information requests” and federal election observers; racially polarized voting; and section 5’s deterrent effect. Id. at 465-66.
As to section 4(b), the district court acknowledged that the legislative record “primarily focused on the persistence of voting discrimination in covered jurisdictions — rather than on the comparative levels of voting discrimination in covered and non-covered jurisdictions.” Id. at 507. Nonetheless, the district court pointed to “several significant pieces of evidence suggesting that the 21st century problem of voting discrimination remains more prevalent in those jurisdictions that have historically been subject to the preclearance requirement” — including the disproportionate number of successful section 2 suits in covered jurisdictions and the “continued prevalence of voting discrimination in covered jurisdictions notwithstanding the considerable deterrent effect of Section 5.” Id. at 506-07. Thus, although observing that Congress’s reauthorization “ensured that Section 4(b) would continue to focus on those jurisdictions with the worst historical records of voting discrimination,” id. at 506, the district court found this continued focus justified by current evidence that discrimination remained concentrated in those jurisdictions. See id. (explaining that Congress did not renew the coverage formula to punish past sins, but rather because it found “substantial evidence of contemporary voting discrimination by the very same jurisdictions that had histories of unconstitutional conduct”). Finally, the district court emphasized that Congress had based reauthorization not on “a per *858 functory review of a few isolated examples of voting discrimination by covered jurisdictions,” but had “ ‘approached its task seriously and with great care.’ ” Id. at 496 (quoting Nw. Austin, 573 F.Supp.2d at 265). Given this, the district court concluded that Congress’s predictive judgment about the continued need for section 5 in covered jurisdictions was due “substantial deference,” id. at 498 (internal quotation marks omitted), and therefore “decline[d] to overturn Congress’s carefully considered judgment,” id. at 508. Our review is de novo. See McGrath v. Clinton, 666 F.3d 1377, 1379 (D.C.Cir.2012) (“We review the district court’s decision to grant summary judgment de novo.”).
On appeal, Shelby County reiterates its argument that, given the federalism costs section 5 imposes, the provision can be justified only by contemporary evidence of the kind of “‘unremitting and ingenious defiance’ ” that existed when the Voting Rights Act was originally passed in 1965. Appellant’s Br. 8 (quoting Katzenbach, 383 U.S. at 309, 86 S.Ct. 803). Insisting that the legislative record lacks “evidence of a systematic campaign of voting discrimination and gamesmanship by the covered jurisdictions,” Shelby County contends that section 5’s remedy is unconstitutional because it is no longer congruent and proportional to the problem it seeks to cure. Id. at 8-9; see also City of Boerne v. Flores, 521 U.S. 507, 520, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (“There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.”). In addition, Shelby County argues, section 4(b) contains an “obsolete” coverage formula that fails to identify the problem jurisdictions, and because the jurisdictions it covers are not uniquely problematic, the formula is no longer rational “ ‘in both practice and theory.’ ” Appellant’s Br. 11-12 (quoting Katzenbach, 383 U.S. at 330, 86 S.Ct. 803).
III.
Northwest Austin sets the course for our analysis, directing us to conduct two principal inquiries. First, emphasizing that section 5 “authorizes federal intrusion into sensitive areas of state and local policymaking that imposes substantial federalism costs,” the Court made clear that “[p]ast success alone ... is not adequate justification to retain the preclearance requirements.” 129 S.Ct. at 2511. Conditions in the South, the Court pointed out, “have unquestionably improved”: racial disparities in voter registration and turnout have diminished or disappeared, and “minority candidates hold office at unprecedented levels.” Id. Of course, “[i]t may be that these improvements are insufficient and that conditions continue to warrant preelearance under the Act.” Id. at 2511-12. But “the Act imposes current burdens,” and we must determine whether those burdens are “justified by current needs.” Id. at 2512.
Second, the Act, through section 4(b)’s coverage formula, “differentiates between the States, despite our historic tradition that all the States enjoy equal sovereignty.” Id. (internal quotation marks omitted). And while equal sovereignty “ ‘does not bar ... remedies for local evils,’ ” id. (omission in original) (quoting Katzenbach, 383 U.S. at 328-29, 86 S.Ct. 803), the Court warned that section 4(b)’s coverage formula may “fail[ ] to account for current political conditions” — that is, “[t]he evil that § 5 is meant to address may no longer be concentrated in the jurisdictions singled out for preclearance.” Id. These concerns, the Court explained, “are underscored by the argument” that section 5 may require covered jurisdictions to adopt race-conscious measures that, if adopted by non-covered jurisdictions, could violate section 2 of the Act or the Fourteenth Amendment. Id. (citing Georgia v. *859 Ashcroft, 539 U.S. at 491, 123 S.Ct. 2498 (Kennedy, J., concurring) (“[C]onsiderations of race that would doom a redistricting plan under the Fourteenth Amendment or § 2 seem to be what save it under § 5.”)). To be sure, such “[distinctions can be justified in some cases.” Id. But given section 5’s serious federalism costs, Northwest Austin requires that we ask whether section 4(b)’s “disparate geographic coverage is sufficiently related to the problem that it targets.” Id.
Before addressing Northwest Austin’s two questions, we must determine the appropriate standard of review. As the Supreme Court noted, the standard applied to legislation enacted pursuant to Congress’s Fifteenth Amendment power remains unsettled. See id. at 2512-13 (noting, but declining to resolve the parties’ dispute over the appropriate standard of review). Reflecting this uncertainty, Shelby County argues that the “congruence and proportionality” standard for Fourteenth Amendment legislation applies, see City of Boerne, 521 U.S. at 520, 117 S.Ct. 2157, whereas the Attorney General insists that Congress may use “any rational means” to enforce the Fifteenth Amendment, see Katzenbach, 383 U.S. at 324, 86 S.Ct. 803. Although the Supreme Court declined to resolve this issue in Northwest Austin, the questions the Court raised— whether section 5’s burdens are justified by current needs and whether its disparate geographic reach is sufficiently related to that problem — seem to us the very questions one would ask to determine whether section 5 is “congruen[t] and proportion-alt ] [to] the injury to be prevented,” City of Boerne, 521 U.S. at 520, 117 S.Ct. 2157. We thus read Northwest Austin as sending a powerful signal that congruence and proportionality is the appropriate standard of review. In any event, if section 5 survives the arguably more rigorous “congruent and proportional” standard, it would also survive Katzenbach’s “rationality” review.
Of course, this does not mean that the Supreme Court’s prior decisions upholding the Voting Rights Act are no longer relevant. Quite to the contrary, Katzenbach and City of Rome tell us a great deal about “[t]he evil that § 5 is meant to address,” Nw. Austin, 129 S.Ct. at 2512, as well as the types of evidence that are probative of “current needs,” id. Moreover, City of Boeme relied quite heavily on Katzenbach for the proposition that section 5, as originally enacted and thrice extended, was a model of congruent and proportional legislation. See City of Boerne, 521 U.S. at 525-26, 530, 117 S.Ct. 2157 (relying on Katzenbach to explain how the Court evaluates remedial legislation under the Fourteenth and Fifteenth Amendments); see also id. at 532-33, 117 S.Ct. 2157 (describing characteristics of the Voting Rights Act, as analyzed by Katzenbach and City of Rome, that made it congruent and proportional).
We can likewise seek guidance from the Court’s Fourteenth Amendment decisions applying the congruent and proportional standard to other legislation. In those cases, the Court made clear that the record compiled by Congress must contain evidence of state “conduct transgressing the Fourteenth Amendment’s substantive provisions,” Coleman v. Court of Appeals of Md., — U.S. -, 132 S.Ct. 1327, 1333, 182 L.Ed.2d 296 (2012), and that invasions of state interests based on “abstract generalities,” id. at 1337, or “supposition and conjecture,” id. at 1336, cannot be sustained. Once satisfied that Congress has identified a pattern of constitutional violations, however, the Court has deferred to Congress’s judgment, even in the face of a rather sparse legislative record. In Nevada Department of Human Resources v. Hibbs, for example, the Court *860 upheld the constitutionality of the family-care provision of the Family and Medical Leave Act, which allows eligible employees to take up to twelve weeks of unpaid leave, and “creates a private right of action to seek both equitable relief and money damages against any employer (including a public agency).” 538 U.S. 721, 724, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003) (internal quotation marks omitted). Although evidence of discriminatory leave policies by state governments was hardly extensive, see Tennessee v. Lane, 541 U.S. 509, 528-29 & n. 17, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004) (describing the limited evidence relied upon in Hibbs, “little of which concerned unconstitutional state conduct”), the Court deferred to Congress’s “reasonable] conclu[sions],” Hibbs, 538 U.S. at 734, 123 S.Ct. 1972, and held that the evidence was “weighty enough to justify” prophylactic legislation, id. at 735, 123 S.Ct. 1972. Similarly, in Lane the Court considered whether Congress had authority under the Fourteenth Amendment to pass Title II of the Americans with Disabilities Act, which prohibits public entities, including states, from discriminating on the basis of disability in their services, programs, and activities. 541 U.S. at 513, 124 S.Ct. 1978. Looking into the record and noting the long history of state discrimination against disabled individuals, the Court found it “not difficult to perceive the harm that Title II is designed to address.” See id. at 524-25, 124 S.Ct. 1978. It held, again with great deference to Congress’s take on the evidence, that the record, “including judicial findings of unconstitutional state action, and statistical, legislative, and anecdotal evidence of the widespread exclusion of persons with disabilities from the enjoyment of public services,” made “clear beyond peradventure” that Title II was appropriate prophylactic legislation, id. at 529, 124 S.Ct. 1978 — and this despite the fact that the record included only two reported decisions finding unconstitutional state action of the precise type at issue, see id. at 544, 124 S.Ct. 1978 (Rehnquist, C.J., dissenting). By contrast, the Court has found that Congress exceeded its Fourteenth Amendment authority where the legislative record revealed a “virtually complete absence” of evidence of unconstitutional state conduct. Id. at 521, 124 S.Ct. 1978 (majority opinion) (citing Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank, 527 U.S. 627, 647-48, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999)); see also City of Boerne, 521 U.S. at 530, 117 S.Ct. 2157 (legislative record “lack[ed] examples of modern instances” of the targeted constitutional violations); Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 89, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (“Congress never identified any pattern of age discrimination by the States, much less any discrimination whatsoever that rose to the level of constitutional violation.”).
We read this case law with two important qualifications. First, we deal here with racial discrimination in voting, one of the gravest evils that Congress can seek to redress. See Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (“[The right to vote] is regarded as a fundamental political right, because preservative of all rights.”); Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 216, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (“racial classifications [are] constitutionally suspect and subject to the most rigid scrutiny” (citation omitted) (internal quotation marks omitted)). When Congress seeks to combat racial discrimination in voting— protecting both the right to be free from discrimination based on race and the right to be free from discrimination in voting, two rights subject to heightened scrutiny — it acts at the apex of its power. See Hibbs, 538 U.S. at 736, 123 S.Ct. 1972 (noting that it is “easier for Congress to *861 show a pattern of unconstitutional violations” when it enforces rights subject to heightened scrutiny); Lane, 541 U.S. at 561-63, 124 S.Ct. 1978 (Scalia, J., dissenting) (“Giving [Congress’s enforcement powers] more expansive scope with regard to measures directed against racial discrimination by the States accords to practices that are distinctively violative of the principal purpose of the [Reconstruction Amendments] a priority of attention that [the Supreme] Court envisioned from the beginning, and that has repeatedly been reflected in [the Court’s] opinions.”). Expressly prohibited by the Fifteenth Amendment, racial discrimination in voting is uniquely harmful in several ways: it cannot be remedied by money damages and, as Congress found, lawsuits to enjoin discriminatory voting laws are costly, take years to resolve, and leave those elected under the challenged law with the benefit of incumbency.
Second, although the federalism costs imposed by the statutes at issue in Hibbs and Lane (abrogating sovereign immunity to allow suits against states for money damages) are no doubt substantial, the federalism costs imposed by section 5 are a great deal more significant. To be sure, in most cases the preclearance process is “routine” and “efficient ],” resulting in prompt approval by the Attorney General and rarely if ever delaying elections. See Reauthorizing the Voting Rights Act’s Temporary Provisions: Policy Perspectives and Views from the Field: Hearing Before the Subcomm. on the Constitution, Civil Rights and Property Rights of the S. Comm, on the Judiciary, 109th Cong. 312-13 (2006) (testimony of Donald M. Wright, North Carolina State Board of Elections) (stating that most preclearance submissions “take only a few minutes to prepare” and that the Justice Department cooperates with jurisdictions to ensure that “preclearance issue[s] d[o] not delay an election”). But section 5 sweeps broadly, requiring preclearance of every voting change no matter how minor. Section 5 also places the burden on covered jurisdictions to demonstrate to the Attorney General or a three-judge district court here in Washington that the proposed law is not discriminatory. Given these significant burdens, in order to determine whether section 5 remains congruent and proportional we are obligated to undertake a review of the record more searching than the Supreme Court’s review in Hibbs and Lane.
Although our examination of the record will be probing, we remain bound by fundamental principles of judicial restraint. Time and time again the Supreme Court has emphasized that Congress’s laws are entitled to a “presumption of validity.” City of Boerne, 521 U.S. at 535, 117 S.Ct. 2157. As the Court has explained, when Congress acts pursuant to its enforcement authority under the Reconstruction Amendments, its judgments about “what legislation is needed ... are entitled to much deference.” Id. (internal quotation marks omitted). Even when applying intermediate scrutiny, the Court has accorded Congress deference “out of respect for its authority to exercise the legislative power,” and in recognition that Congress “is far better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon legislative questions.” Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 195, 196, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (internal quotation marks omitted) (rejecting a First Amendment challenge to the “must-carry” provisions of the Cable Television Consumer Protection and Competition Act). And critically for our purposes, although Northwest Austin raises serious questions about section 5’s constitutionality, nothing in that opinion alters our duty to resolve those questions using traditional principles of *862 deferential review. Indeed, the Court reiterated not only that “judging the constitutionality of an Act of Congress is ‘the gravest and most delicate duty that [a court] is called on to perform,’ ” Nw. Austin, 129 S.Ct. at 2513 (quoting Blodgett v. Holden, 275 U.S. 142, 147-48, 48 S.Ct. 105, 72 L.Ed. 206 (1927) (Holmes, J., concurring)), but also that “[t]he Fifteenth Amendment empowers ‘Congress,’ not the Court, to determine in the first instance what legislation is needed to enforce it,” id.
A.
Guided by these principles, we begin with Northwest Austin’s first question: Are the current burdens imposed by section 5 “justified by current needs”? 129 S.Ct. at 2512. The Supreme Court raised this question because, as it emphasized and as Shelby County argues, the conditions which led to the passage of the Voting Rights Act “have unquestionably improved!,] ... no doubt due in significant part to the Voting Rights Act itself.” Id. at 2511. Congress also recognized this progress when it reauthorized the Act, finding that “many of the first generation barriers to minority voter registration and voter turnout that were in place prior to the [Voting Rights Act] have been eliminated.” H.R.Rep. No. 109-478, at 12. The dissent’s charts nicely display this progress. Racial disparities in voter registration and turnout have “narrowed considerably” in covered jurisdictions and are now largely comparable to disparities nationwide. Id. at 12-17; see also Dissenting Op. at 890-91 figs.I & II. Increased minority voting, in turn, has “resulted in significant increases in the number of African-Americans serving in elected offices.” H.R.Rep. No. 109-478, at 18; see also Dissenting Op. at 892 fig.III. For example, in the six states fully covered by the 1965 Act, the number of African Americans serving in elected office increased from 345 to 3700 in the decades since 1965. H.R.Rep. No. 109-478, at 18.
But Congress found that this progress did not tell the whole story. It documented “continued registration and turnout disparities” in both Virginia and South Carolina. Id. at 25. Virginia, in particular, “remain[ed] an outlier,” S.Rep. No. 109-295, at 11 (2006): although 71.6 percent of white, non-Hispanic voting age residents registered to vote in 2004, only 57.4 percent of black voting age residents registered, a 14.2-point difference. U.S. Census Bureau, Reported Voting and Registration of the Total Voting-Age Population, at tbl.4a, available at http://www. census.gov/hhes/www/socdemo/voting/ publications/p20/2004/tables.html (last visited May 9, 2012). Also, although the number of African Americans holding elected office had increased significantly, they continued to face barriers to election for statewide positions. Congress found that not one African American had yet been elected to statewide office in Mississippi, Louisiana, or South Carolina. In other covered states, “ ‘often it is only after blacks have been first appointed to a vacancy that they are able to win statewide office as incumbents.’ ” H.R.Rep. No. 109-478, at 33 (quoting Nat’l Comm’n on the Voting Rights Act, Protecting Minority Voters: The Voting Rights Act at Work 1982-2005, at 38 (2006) (“Nat’l Comm’n Report”)).
Congress considered other types of evidence that, in its judgment, “show[ed] that attempts to discriminate persist and evolve, such that Section 5 is still needed to protect minority voters in the future.” Id. at 21. It heard accounts of specific instances of racial discrimination in voting. It heard analysis and opinions by experts on all sides of the issue. It considered, among other things, six distinct categories *863 of evidence: (1) Attorney General objections issued to block proposed voting changes that would, in the Attorney General’s judgment, have the purpose or effect of discriminating against minorities; (2) “more information requests” issued when the Attorney General believes that the information submitted by a covered jurisdiction is insufficient to allow a preclearance determination; (3) successful lawsuits brought under section 2 of the Act; (4) federal observers dispatched to monitor elections under section 8 of the Act; (5) successful section 5 enforcement actions filed against covered jurisdictions for failing to submit voting changes for preclearance, as well as requests for preclearance denied by the United States District Court for the District of Columbia; and (6) evidence that the mere existence of section 5 deters officials from even proposing discriminatory voting changes. Finally, Congress heard evidence that case-by-case section 2 litigation was inadequate to remedy the racial discrimination in voting that persisted in covered jurisdictions.
Before delving into the legislative record ourselves, we consider two arguments raised by Shelby County that, if meritorious, would significantly affect how we evaluate that record.
First, Shelby County argues that section 5 can be sustained only on the basis of current evidence of “a widespread pattern of electoral gamesmanship showing systematic resistance to the Fifteenth Amendment.” Appellant’s Br. 23. According to the County, the preclearance remedy may qualify as congruent and proportional only “when it addresses a coordinated campaign of discrimination intended to circumvent the remedial effects of direct enforcement of Fifteenth Amendment voting rights.” Id. at 7. We disagree. For one thing, how could we demand evidence of gamesmanship of the sort present at the time of Katzenbach given that section 5 preclearance makes such tactics virtually impossible? Equally important, Shelby County’s argument rests on a misreading of Katzenbach. Although the Court did describe the situation in 1965 as one of “unremitting and ingenious defiance of the Constitution,” Katzenbach, 383 U.S. at 309, 86 S.Ct. 803, nothing in Katzenbach suggests that such gamesmanship was necessary to the Court’s judgment that section 5 was constitutional. Rather, the critical factor was that “Congress had found that ease-by-case litigation was inadequate to combat widespread and persistent discrimination in voting.” Id. at 328, 86 S.Ct. 803; see also id. at 313-15, 86 S.Ct. 803 (explaining why laws facilitating case-by-case litigation had “proved ineffective”). In City of Rome, the Court, while recognizing that “undeniable” progress had been made, sustained section 5’s constitutionality without ever mentioning gamesmanship of any kind, 446 U.S. at 181-82, 100 S.Ct. 1548; it relied instead on racial disparities in registration, the low number of minority elected officials, and the number and nature of Attorney General objections, id. at 180-81, 100 S.Ct. 1548. Reinforcing this interpretation of Katzenbach and City of Rome, the Supreme Court explained in City of Boeme that “[t]he [Voting Rights Act’s] new, unprecedented remedies were deemed necessary given the ineffectiveness of the existing voting rights laws, and the slow, costly character of case-by-case litigation,” 521 U.S. at 526, 117 S.Ct. 2157 (citation omitted). The Court reiterated the point in Board of Trustees of the University of Alabama v. Garrett, 531 U.S. 356, 373, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001): “In [enacting the Voting Rights] Act ... Congress also determined that litigation had proved ineffective.... ”
This emphasis on the inadequacy of case-by-case litigation makes sense: if section 2 litigation is adequate *864 to deal with the magnitude and extent of constitutional violations in covered jurisdictions, then Congress might have no justification for requiring states to preclear their voting changes. Put another way, what is needed to make section 5 congruent and proportional is a pattern of racial discrimination in voting so serious and widespread that case-by-case litigation is inadequate. Given this, the question before us is not whether the legislative record reflects the kind of “ingenious defiance” that existed prior to 1965, but whether Congress has documented sufficiently widespread and persistent racial discrimination in voting in covered jurisdictions to justify its conclusion that section 2 litigation remains inadequate. If it has, then section 5’s “substantial federalism costs” remain justified because preclearance is still needed to remedy continuing violations of the Fifteenth Amendment.
Second, Shelby County urges us to disregard much of the evidence Congress considered because it involves “vote dilution, going to the weight of the vote once cast, not access to the ballot.” Appellant’s Br. 26. Specifically, the County faults Congress for relying on selective annexations, certain redistricting techniques, at-large elections, and other practices that do not prevent minorities from voting but instead “dilute minority voting strength,” 2006 Act § 2(b)(4)(A). According to the County, because the Supreme Court has “never held that vote dilution violates the Fifteenth Amendment,” Bossier II, 528 U.S. at 334 n. 3, 120 S.Ct. 866, we may not rely on such evidence to sustain section 5 as a valid exercise of Congress’s Fifteenth Amendment enforcement power.
It is true that neither the Supreme Court nor this court has ever held that intentional vote dilution violates the Fifteenth Amendment. But the Fourteenth Amendment prohibits vote dilution intended “invidiously to minimize or cancel out the voting potential of racial or ethnic minorities.” City of Mobile v. Bolden, 446 U.S. 55, 66, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980); see also, e.g., Shaw v. Reno, 509 U.S. 630, 641, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). Although the Court’s previous decisions upholding section 5 focused on Congress’s power to enforce the Fifteenth Amendment, the same “congruent and proportional” standard, refined by the inquiries set forth in Northwest Austin, appears to apply “irrespective of whether Section 5 is considered [Fifteenth Amendment] enforcement legislation, [Fourteenth Amendment] enforcement legislation, or a kind of hybrid legislation enacted pursuant to both amendments.” Shelby Cnty., 811 F.Supp.2d at 462 (footnote omitted); see also City of Boerne, 521 U.S. at 518, 117 S.Ct. 2157 (suggesting that Congress’s “power to enforce the provisions of the Fifteenth Amendment” is “parallel” to its power to enforce the Fourteenth Amendment). Indeed, when reauthorizing the Act in 2006, Congress expressly invoked its enforcement authority under both the Fourteenth and Fifteenth Amendments. See H.R.Rep. No. 109-478, at 90 (“[T]he Committee finds the authority for this legislation under amend. XIV, § 5 and amend. XV, § 2.”); id. at 53 & n. 136, 100 S.Ct. 1490 (stating that Congress is acting under its Fourteenth and Fifteenth Amendment powers in reauthorizing the Voting Rights Act). Accordingly, like Congress and the district court, we think it appropriate to consider evidence of unconstitutional vote dilution in evaluating section 5’s validity. See City of Rome, 446 U.S. at 181, 100 S.Ct. 1548 (citing Congress’s finding that “[a]s registration and voting of minority citizens increasef ], other measures may be resorted to which would dilute increasing minority voting strength” as evidence of the continued *865 need for section 5 (internal quotation marks omitted)).
Consideration of this evidence is especially important given that so-called “second generation” tactics like intentional vote dilution are in fact decades-old forms of gamesmanship. That is, “as African Americans made progress in abolishing some of the devices whites had used to prevent them from voting,” both in the late nineteenth century and again in the 1950s and 1960s, “[ojfficials responded by adopting new measures to minimize the impact of black reenfranchisement.” Voting Rights Act: Evidence of Continued Need: Hearing Before the Subcomm. on the Constitution of the H. Comm, on the Judiciary, 109th Cong. 141-43 (2006) (“Evidence of Continued Need ”). These measures— “well-known” tactics such as “ ‘packing]’ ” minorities into a single district, spreading minority voters thinly among several districts, annexing predominately white suburbs, and so on — were prevalent “forms of vote dilution” then, and Congress determined that these persist today. Id. Specifically, Congress found that while “first generation barriers” — flagrant attempts to deny access to the polls that were pervasive at the time of Katzenbach — have diminished, “second generation barriers” such as vote dilution have been “constructed to prevent minority voters from fully participating in the electoral process.” 2006 Act § 2(b)(2) (congressional findings). Although such methods may be “more subtle than the visible methods used in 1965,” Congress concluded that their “effect and results are the same, namely a diminishing of the minority community’s ability to fully participate in the electoral process and to elect their preferred candidates of choice.” H.R.Rep. No. 109^178, at 6.
Having resolved these threshold issues, we return to the basic question: Does the legislative record contain sufficient probative evidence from which Congress could reasonably conclude that racial discrimination in voting in covered jurisdictions is so serious and pervasive that section 2 litigation remains an inadequate remedy? Reviewing the record ourselves and focusing on the evidence most probative of ongoing constitutional violations, we believe it does.
To begin with, the record contains numerous “examples of modern instances” of racial discrimination in voting, City of Boerne, 521 U.S. at 530, 117 S.Ct. 2157. Just a few recent examples:
• Kilmichael, Mississippi’s abrupt 2001 decision to cancel an election when “an unprecedented number” of African Americans ran for office, H.R.Rep. No. 109^178, at 36-37 (internal quotation marks omitted);
• Webster County, Georgia’s 1998 proposal to reduce the black population in three of the education board’s five single-member districts after the school district elected a majority black school board for the first time, Voting Rights Act: Section 5 of the Act — History, Scope, and Purpose: Hearing Before Subcomm. on the Constitution of the House Judiciary Comm., 109th Cong. 830-31 (2006) (“History, Scope, and Purpose ”);
• Mississippi’s 1995 attempt to evade preclearance and revive a dual registration system “initially enacted in 1892 to disenfranchise Black voters” and previously struck down by a federal court, H.R.Rep. No. 109-478, at 39;
• Washington Parish, Louisiana’s 1993 attempt to reduce the impact of a majority-African American district by “immediately creating] a new at-large seat to ensure that no white incumbent would lose his seat,” id. at 38;
• Waller County, Texas’s 2004 attempt to reduce early voting at polling places near a historically black university and its threats to prosecute students for *866 “illegal voting,” after two black students announced their intent to run for office, Evidence of Continued Need 185-86.
The legislative record also contains examples of overt hostility to black voting power by those who control the electoral process. In Mississippi, for instance, state legislators opposed an early 1990s redistricting plan that would have increased the number of black majority districts, referring to the plan publicly as the “black plan” and privately as the “nigger plan,” Modem Enforcement of the Voting Rights Act: Hearing Before the S. Comm, on the Judiciary, 109th Cong. 22 (2006) (“Modem Enforcement ”) (internal quotation marks omitted); see also S.Rep. No. 109-295, at 14. In Georgia, the state House Reapportionment Committee Chairman “told his colleagues on numerous occasions, T don’t want to draw nigger districts,’ ” H.R.Rep. No. 109-478, at 67 (quoting Busbee v. Smith, 549 F.Supp. 494, 501 (D.D.C.1982)). The district court pointed to numerous additional examples of intentional discrimination in the legislative record. See Shelby Cnty., 811 F.Supp.2d at 472-76, 477-79, 480-81, 481-85, 485-87; see also Nw. Austin, 573 F.Supp.2d at 258-62, 289-301.
In addition to these examples of flagrant racial discrimination, several categories of evidence in the record support Congress’s conclusion that intentional racial discrimination in voting remains so serious and widespread in covered jurisdictions that section 5 preclearance is still needed. We explore each in turn.
First, Congress documented hundreds of instances in which the Attorney General, acting pursuant to section 5, objected to proposed voting changes that he found would have a discriminatory purpose or effect. Significantly, Congress found that the absolute number of objections has not declined since the 1982 reauthorization: the Attorney General interposed at least 626 objections during the twenty-two years from 1982 to 2004 (an average of 28.5 each year), compared to 490 interposed during the seventeen years from 1965 to 1982 (an average of 28.8 each year). Evidence of Continued Need 172; see also S.Rep. No. 109-295, at 13-14 (finding 754 objections between 1982 and the first half of 2006).
Formal objections were not the only way the Attorney General blocked potentially discriminatory changes under section 5. Congress found that between 1990 and 2005, “more information requests” (MIRs) prompted covered jurisdictions to withdraw or modify over 800 proposed voting changes. Evidence of Continued Need 2553, 2565; H.R.Rep. No. 109-478, at 40-41. Although MIRs take no position on the merits of a preclearance request, Congress had evidence indicating that the Attorney General sometimes uses them to “send signals to a submitting jurisdiction about the assessment of their proposed voting change” and to “promot[e] compliance by covered jurisdictions.” Evidence of Continued Need 2541. Congress found that because “[t]he actions taken by a jurisdiction [in response to an MIR] are often illustrative of [its] motives,” the high number of withdrawals and modifications made in response to MIRs constitutes additional evidence of “[e]fforts to discriminate over the past 25 years.” H.R.Rep. No. 109-478, at 40-41.
Shelby County contends that section 5 objections and MIRs, however numerous, “do[ ] not signal intentional voting discrimination” because they represent only the Attorney General’s opinion and need not be based on discriminatory intent. Appellant’s Br. 30-31; see also id. at 32. Underlying this argument is a fundamental principle with which we agree: to sustain section 5, the record must contain “evidence of a pattern of constitutional violations,” Hibbs, 538 U.S. at 729, 123 *867 S.Ct. 1972, and voting changes violate the constitution only if motivated by discriminatory animus, Reno v. Bossier Parish Sch. Bd., 520 U.S. 471, 481, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997) {“Bossier I”). Although not all objections rest on an affirmative finding of intentional discrimination, the record contains examples of many that do. See Nw. Austin, 573 F.Supp.2d at 289-301 (appendix providing examples of objections based on discriminatory intent). Between 1980 and 2004, the Attorney General issued at least 423 objections based in whole or in part on discriminatory intent. Voting Rights Act: Section 5 — Preclearance Standards: Hearing Before the Subcomm. on the Constitution of the H. Comm, on the Judiciary, 109th Cong. 180-81 (2005) {“Preclearance Standards ”). Moreover, in the 1990s, before the Supreme Court limited the Attorney General’s ability to object based on discriminatory but non-retrogressive intent, see Bossier II, 528 U.S. 320, 120 S.Ct. 866 (limiting the scope of section 5’s purpose prong in a decision overturned by the 2006 Act), “the purpose prong of Section 5 had become the dominant legal basis for objections,” Preclearance Standards 177, with seventy-four percent of objections based in whole or in part on discriminatory intent, id. at 136. Although it is true that objections represent “only one side’s opinion,” Appellant’s Br. 30, Congress is entitled to rely upon the Attorney General’s considered judgment “when it prescribes civil remedies ... under [section] 2 of the Fifteenth Amendment.” Katzenbach, 383 U.S. at 330, 86 S.Ct. 803 (explaining that “Congress obviously may avail itself of information from any probative source,” including evidence “adduced by the Justice Department”). In fact, in City of Rome the Supreme Court considered objections to be probative evidence of unconstitutional voting discrimination. See 446 U.S. at 181, 100 S.Ct. 1548.
Shelby County also points out that the percentage of proposed voting changes blocked by Attorney General objections has steadily declined — from a height of 4.06 percent (1968-1972) to 0.44 percent (1978-1982) to 0.17 percent (1993-1997) and to 0.05 percent (1998-2002). An Introduction to the Expiring Provisions of the Voting Rights Act and Legal Issues Relating to Reauthorization: Hearing Before the S. Comm, on the Judiciary, 109th Cong. 219 (2006) (“Introduction to the Expiring Provisions”). But the most dramatic decline in the objection rate — which, as the district court observed, “has always been low,” Shelby Cnty., 811 F.Supp.2d at 470 — occurred in the 1970s, before the Supreme Court upheld the Act for a third time in City of Rome. See Introduction to the Expiring Provisions 219. Also, the average number of objections per year has not declined, suggesting that the level of discrimination has remained constant as the number of proposed voting changes, many likely quite minor, has increased. See H.R.Rep. No. 109-478, at 22 (showing increase in the annual number of voting changes submitted for preclearance, from 300-400 per year in the early 1970s to 4000-5000 per year in the 1990s and 2000s). As the district court pointed out, there may be “many plausible explanations for the recent decline in objection rates.” See Shelby Cnty., 811 F.Supp.2d at 471. Even in the six years from 2000 to 2006, after objection rates had dropped to their lowest, Attorney General objections affected some 660,000 minority voters. The Continuing Need for Section 5 Pre-Clearance: Hearing Before the S. Comm, on the Judiciary, 109th Cong. 58 (2006) (“Continuing Need”). Ultimately, Congress believed that the absolute number of objections represented the better indicator of the extent of discrimination in covered jurisdictions. This judgment — whether to accord greater weight to absolute numbers *868 or to objection rates — is precisely the kind that a legislature is “far better equipped” than a court to evaluate, Turner Broad., 520 U.S. at 195, 117 S.Ct. 1174 (internal quotation marks omitted).
As for MIRs, we agree with Shelby County that they are less probative of discrimination than objections. An MIR does not represent a judgment on the merits, and submitting jurisdictions might have many reasons for modifying or withdrawing a proposed change in response to one. But the record contains evidence from which Congress could “reasonably] infer[ ],” id. (internal quotation marks omitted), that at least some withdrawals or modifications reflect the submitting jurisdiction’s acknowledgement that the proposed change was discriminatory. See Evidence of Continued Need 178 (stating that a jurisdiction’s decision to withdraw a proposed changes in response to an MIR “is frequently a tacit admission of one or more proposed discriminatory changes”); id. at 809-10 (explaining that after the Attorney General requested more information on a redistricting plan containing only two majority-black districts, the jurisdiction withdrew the proposal and ultimately adopted a redistricting plan with three majority-black districts); H.R.Rep. No. 109-478, at 41 (explaining that Monterey County’s proposal to reduce the number of polling places received preclearance only after the County withdrew five polling place consolidations in response to an MIR). Given this, Congress reasonably concluded that some of the 800-plus withdrawals and modifications in response to MIRs “reflect! ]” “[e]fforts to discriminate over the past 25 years.” H.R.Rep. No. 109-478, at 40.
The second category of evidence relied on by Congress, successful section 2 litigation, reinforces the pattern of discrimination revealed by objections and MIRs. The record shows that between 1982 and 2005, minority plaintiffs obtained favorable outcomes in some 653 section 2 suits filed in covered jurisdictions, providing relief from discriminatory voting practices in at least 825 counties. Evidence of Continued Need 208, 251. Shelby County faults the district court for relying on evidence of successful section 2 litigation “even though ‘a violation of Section 2 does not require a showing of unconstitutional discriminatory intent.’ ” Appellant’s Br. 34 (quoting Shelby Cnty., 811 F.Supp.2d at 481). The County’s premise is correct: although the Constitution prohibits only those voting laws motivated by discriminatory intent, section 2 prohibits all voting laws for which “ ‘based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected] class.’ ” Bartlett v. Strickland, 556 U.S. 1, 10-11, 129 S.Ct. 1231, 173 L.Ed.2d 173 (2009) (quoting 42 U.S.C. § 1973(b)). In practice, however, this “results test,” as applied in section 2 cases, requires consideration of factors very similar to those used to establish discriminatory intent based on circumstantial evidence. Compare Gingles, 478 U.S. at 36-37, 106 S.Ct. 2752 (listing factors considered under the results test), with Rogers v. Lodge, 458 U.S. 613, 623-27, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982) (relying on virtually identical factors to affirm a finding of intentional discrimination). Also, as the district court pointed out, “courts will avoid deciding constitutional questions” if, as is the case in virtually all successful section 2 actions, the litigation can be resolved on narrower grounds. Shelby Cnty., 811 F.Supp.2d at 482; see also, e.g., White v. Alabama, 74 F.3d 1058, 1071 n. 42 (11th Cir.1996) (“Because we dispose of the district court’s judgment on the ground that it violates the Voting Rights Act, we need not, and indeed, should not, discuss wheth *869 er the judgment violates the Equal Protection Clause.”). This explains why the legislative record contains so few published section 2 cases with judicial findings of discriminatory intent, see Dissenting Op. at 26; To Examine the Impact and Effectiveness of the Voting Rights Act: Hearing Before the Subcomm. on the Constitution of the H. Comm, on the Judiciary, 109th Cong. 986-87 (2005) (“Impact and Effectiveness ”) (report by Ellen Katz et al.)— courts have no need to find discriminatory intent once they find discriminatory effect. But Congress is not so limited. Considering the evidence required to prevail in a section 2 case and accounting for the obligation of Article III courts to avoid reaching constitutional questions unless necessary, we think Congress quite reasonably concluded that successful section 2 suits provide powerful evidence of unconstitutional discrimination. In addition, as with Attorney General objections, we cannot ignore the sheer number of successful section 2 cases — 653 over 23 years, averaging more than 28 each year. This high volume of successful section 2 actions is particularly dramatic given that Attorney General objections block discriminatory laws before they can be implemented and that section 5 deters jurisdictions from even attempting to enact such laws, thereby reducing the need for section 2 litigation in covered jurisdictions. See Continuing Need 26 (explaining that section 5 “makes the covered jurisdiction[s] much ‘cleaner’ than they would have been without Section 5 coverage”).
Third, Congress relied on evidence of “the tens of thousands of Federal observers that have been dispatched to observe elections in covered jurisdictions.” 2006 Act § 2(b)(5). Specifically, 300 to 600 observers were dispatched annually between 1984 and 2000, H.R.Rep. No. 109-478, at 44, amounting to 622 separate dispatches (most or all involving multiple observers) to covered jurisdictions, Evidence of Continued Need 180-82; see also 42 U.S.C. § 1973f(a)(2) (authorizing dispatch of federal observers to covered jurisdictions based upon either “written meritorious complaints from residents, elected officials, or civic participation organizations,” or the Attorney General’s judgment that observers are necessary to enforce the Fourteenth or Fifteenth Amendment). Of these, sixty-six percent were concentrated in five of the six states originally covered by section 5 — Alabama, Georgia, Louisiana, Mississippi, and South Carolina. H.R.Rep. No. 109-478, at 44. In some instances, monitoring by federal observers “bec[ame] the foundation of Department of Justice enforcement efforts,” as in Conecuh County, Alabama, and Johnson County, Georgia, where reports by federal observers enabled the federal government to bring suit against county officials for discriminatory conduct in polling locations, ultimately resulting in consent decrees. Id.; see also Voting Rights Act: Sections 6 and 8 — The Federal Examiner and Observer Program: Hearing Before the Sub-comm. on the Constitution of the H. Comm, on the Judiciary, 109th Cong. 42-43 (2006) (“Sections 6 and 8 ”). As Congress saw it, this continued need for federal observers in covered jurisdictions is indicative of discrimination and “demonstrates that the discriminatory conduct experienced by minority voters is not solely limited to tactics to dilute the voting strength of minorities but continues to include tactics to disenfranchise, such as harassment and intimidation inside polling locations.” H.R.Rep. No. 109-478, at 44.
Shelby County insists that the Attorney General’s decision to dispatch federal observers “indicates only that ... there might be conduct with the effect of disenfranchising minority citizens, which might or might not be purposeful discrimination.” Appellant’s Br. 35-36. As the district court explained, however, “observers *870 are not assigned to a particular polling location based on sheer speculation; they are only dispatched if ‘there is a reasonable belief that minority citizens are at risk of being disenfranchised.’ ” Shelby Cnty., 811 F.Supp.2d at 486 (quoting H.R.Rep. No. 109-478, at 44). Indeed, the Justice Department conducts pre-election investigations in order to identify jurisdictions where federal observers are likely to be necessary. See Sections 6 and 8, at 37-39 (explaining that the Justice Department conducts pre-election surveys and field investigations to identify jurisdictions where federal observers will be needed). The record shows that federal observers in fact witnessed discrimination at the polls, sometimes in the form of intentional harassment, intimidation, or disparate treatment of minority voters. See id. at 30-31 (describing discriminatory treatment and harassment of minorities by poll officials in Alabama); id. at 34 (describing discriminatory treatment of minority voters in Texas and Arizona); id. at 43 (describing the exclusion of African Americans from service as poll workers in Johnson County, Georgia). Thus, although the deployment of federal observers is hardly conclusive evidence of unconstitutional discrimination, we think Congress could reasonably rely upon it as modest, additional evidence of current needs.
Fourth, Congress found evidence of continued discrimination in two types of preclearance-related lawsuits. Examining the first of these — actions brought to enforce section 5’s preclearance requirement— Congress noted that “many defiant covered jurisdictions and State and local officials continue to enact and enforce changes to voting procedures without the Federal Government’s knowledge.” H.R.Rep. No. 109-478, at 41. Between 1982 and 2004, at least 105 successful section 5 enforcement actions were brought against such jurisdictions. Evidence of Continued Need 250. Shelby County believes that successful section 5 enforcement actions are “not reliable evidence of intentional voting discrimination” because “[t]he most that a section 5 enforcement action can establish ... is that a voting change — and quite possibly a nondiscriminatory voting change — was not properly submitted for preclearance.” Appellant’s Br. 34. But the legislative record does contain evidence that at least some of the 105 successful section 5 enforcement suits were initiated in response to attempts by covered jurisdictions to implement purposefully discriminatory laws without federal oversight. See Shelby Cnty., 811 F.Supp.2d at 480 (describing section 5 actions against Mississippi and Waller County, Texas, “in which the unprecleared voting changes appeared to have been motivated by discriminatory animus”); Evidence of Continued Need 176 (explaining that after a section 5 enforcement suit forced Mississippi to submit its dual registration law for preclearance, the Attorney General objected based on the law’s racially discriminatory purpose and effect). Therefore, Congress could reasonably have concluded that such cases, even if few in number, provide at least some evidence of continued willingness to evade the Fifteenth Amendment’s protections, for they reveal continued efforts by recalcitrant jurisdictions not only to enact discriminatory voting changes, but to do so in defiance of section 5’s preclearance requirement.
In addition to section 5 enforcement suits, Congress found evidence of continued discrimination in “the number of requests for declaratory judgments [for preclearance] denied by the United States District Court for the District of Columbia.” 2006 Act § 2(b)(4)(B). The number of unsuccessful judicial preclearance actions appears to have remained roughly constant since 1966: twenty-five requests were denied or withdrawn between 1982 *871 and 2004, compared to seventeen between 1966 and 1982. Evidence of Continued Need 177-78, 275. Shelby County does not contest the relevance of this evidence.
Finally, and bolstering its conclusion that section 5 remains necessary, Congress “f[ound] that the existence of Section 5 deterred covered jurisdictions from even attempting to enact discriminatory voting changes.” H.R.Rep. No. 109-478, at 24. In Congress’s view, “Section 5’s strong deterrent effect” and “the number of voting changes that have never gone forward as a result of [that effect]” are “[a]s important as the number of objections that have been interposed to protect minority voters against discriminatory changes” that had actually been proposed. Id. As Congress explained, “ ‘[o]nee officials in covered jurisdictions become aware of the logic of preclearance, they tend to understand that submitting discriminatory changes is a waste of taxpayer time and money and interferes with their own timetables, because the chances are good that an objection will result.’ ” Id. (quoting Nat’l Comm’n Report 57). For this reason, the mere existence of section 5 “ ‘encourage[s] the legislature to ensure that any voting changes would not have a discriminatory effect on minority voters, and that it would not become embroiled in the preclearance process.’ ” Id. (quoting Laughlin McDonald, The Case for Extending and Amending the Voting Rights Act: Voting Rights Litigation, 1982-2006: A Report of the Voting Rights Project of the American Civil Liberties Union 15 (2006)). Congress considered testimony that section 5 has had just this effect on state and local redistricting processes. See H.R.Rep. No. 109-478, at 24 (describing section 5’s “critical” influence on the Georgia legislature’s redistricting process, which culminated in a plan that was precleared with no objection by the Attorney General (internal quotation marks omitted)); Evidence of Continued Need 362-63 (explaining how concerns about obtaining preclearance prevented Fredericksburg, Virginia, from eliminating an African American majority district). In other words, Congress had “some reason to believe that without [section 5’s] deterrent effect on potential misconduct,” the evidence of continued discrimination in covered jurisdictions “might be considerably worse.” S.Rep. No. 109-295, at 11.
Shelby County argues that Congress’s finding of deterrence reflects “ ‘outdated assumptions about racial attitudes in the covered jurisdictions’ ” that we should not “indulge[].” Appellant’s Br. 38 (quoting Nw. Austin, 129 S.Ct. at 2525 (Thomas, J., concurring in judgment in part and dissenting in part)). We agree that evaluating section 5’s deterrent effect raises sensitive and difficult issues. As the dissent rightly points out, the claimed effect is hard to measure empirically and even harder to consider judicially. Dissenting Op. at 898. We also agree with the dissent that section 5 could not stand based on claims of deterrence alone, nor could deterrence be used in some hypothetical case to justify renewal “to the crack of doom,” id. But the difficulty of quantifying the statute’s deterrent effect is no reason to summarily reject Congress’s finding that the evidence of racial discrimination in voting would look worse without section 5 — a finding that flows from record evidence unchallenged by the dissent. As explained above, Congress’s deterrent effect finding rests on evidence of current and widespread voting discrimination, as well as on testimony indicating that section 5’s mere existence prompts state and local legislators to conform their conduct to the law. And Congress’s finding — that is, a finding about how the world would have looked absent section 5 — rests on precisely the type of fact-based, predictive judgment that courts are ill-equipped to second guess. See Turner Broad., 520 U.S. at *872 195, 117 S.Ct. 1174 (“In reviewing the constitutionality of a statute, courts must accord substantial deference to the predictive judgments of Congress.” (internal quotation marks omitted)).
This brings us, then, to Congress’s ultimate conclusion. After considering the entire record, including
• 626 Attorney General objections that blocked discriminatory voting changes;
• 653 successful section 2 cases;
• over 800 proposed voting changes withdrawn or modified in response to MIRs;
• tens of thousands of observers sent to covered jurisdictions;
• 105 successful section 5 enforcement actions;
• 25 unsuccessful judicial preclearance actions;
• and section 5’s strong deterrent effect, i.e., “the number of voting changes that have never gone forward as a result of Section 5,” H.R.Rep. No. 109-478, at 24;
Congress found that serious and widespread intentional discrimination persisted in covered jurisdictions and that “case-by-case enforcement alone ... would leave minority citizens with [an] inadequate remedy.” Id. at 57. In reaching this conclusion, Congress considered evidence that section 2 claims involve “intensely complex litigation that is both costly and time-consuming.” Modem Enforcement 96; see also Introduction to the Expiring Provisions 141 (describing a Federal Judicial Center study finding that voting rights cases require nearly four times more work than an average district court case and rank as the fifth most work-intensive of the sixty-three types of cases analyzed); City of Boerne, 521 U.S at 526, 117 S.Ct. 2157 (noting the “slow costly character of case-by-case litigation” under section 2). It heard from witnesses who explained that “it is incredibly difficult for minority voters to pull together the resources needed” to pursue a section 2 lawsuit, particularly at the local level and in rural communities. Modem Enforcement 96; see also History, Scope, and Purpose 84 (explaining that voters “in local communities and particularly in rural areas ... do not have access to the means to bring litigation under Section 2”). Such testimony is particularly significant given that the vast majority of section 5 objections (92.5 percent from 2000 to 2005) pertained to local voting changes. See Michael J. Pitts, Let’s Not Call the Whole Thing Off Just Yet: A Response to Samuel Issacharojfs Suggestion to Scuttle Section 5 of the Voting Rights Act, 84 Neb. L.Rev. 605, 612-13 (2005); see also id. at 616 (“[S]ection 2 cases are much less likely to be filed when it comes to redistricting in smaller jurisdictions[.]”). Congress also heard testimony that during the time it takes to litigate a section 2 action — often several years— proponents of a discriminatory law may enjoy its benefits, potentially winning elections and gaining the advantage of incumbency before the law is overturned. Impact and Effectiveness 43-44. Given all of this, and given the magnitude and persistence of discrimination in covered jurisdictions, Congress concluded that case-by-case litigation — slow, costly, and lacking section 5’s prophylactic effect — “would be ineffective to protect the rights of minority voters.” H.R.Rep. No. 109-478, at 57.
According to Shelby County, “[evaluation of the probative evidence shows there is no longer systematic resistance to the Fifteenth Amendment in the covered jurisdictions that cannot be solved through case-by-case litigation.” Appellant’s Br. 38. Congress, however, reached a different conclusion, and as explained above, the County has offered no basis for thinking that Congress’s judgment is either unreasonable or unsupported by probative evidence. The dissent accuses us of “over- *873 staffing] the inadequacies of § 2, such as cost and the consequences of delay.” Dissenting Op. at 888. But the conclusion that section 2 is inadequate is Congress’s, not ours. The dissent believes that the costs of section 2 actions can “be assumed by the Department of Justice,” id., but it cites nothing in the record to support such speculation. The dissent also believes that “courts may as always use the standard remedy of a preliminary injunction to prevent irreparable harm caused by adjudicative delay.” Id. at 888. But Congress knows that plaintiffs can seek preliminary injunctions and reasonably determined that this possibility — that plaintiffs with few resources litigating a fact-intensive section 2 case will be able to satisfy the heavy burden required for preliminary injunctive relief — was insufficient to alleviate its concerns about the inadequacy of section 2 actions.
The point at which section 5’s strong medicine becomes unnecessary and therefore no longer congruent and proportional turns on several critical considerations, including the pervasiveness of serious racial discrimination in voting in covered jurisdictions; the continued need for section 5’s deterrent and blocking effect; and the adequacy of section 2 litigation. These are quintessential^ legislative judgments, and Congress, after assembling and analyzing an extensive record, made its decision: section 5’s work is not yet done. Insofar as Congress’s conclusions rest on predictive judgments, we must, contrary to the dissent’s approach, apply a standard of review even “more deferential than we accord to judgments of an administrative agency.” Turner Broad., 520 U.S. at 195, 117 S.Ct. 1174. Given that we may not “displace [an agency’s] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo,” Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951), we certainly cannot do so here. Of course, given the heavy federalism costs that section 5 imposes, our job is to ensure that Congress’s judgment is reasonable and rests on substantial probative evidence. See Turner Broad., 520 U.S. at 195, 117 S.Ct. 1174 (“In reviewing the constitutionality of a statute ... [o]ur sole obligation is to assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence.” (internal quotation marks omitted)). After thoroughly scrutinizing the record and given that overt racial discrimination persists in covered jurisdictions notwithstanding decades of section 5 preclearance, we, like the district court, are satisfied that Congress’s judgment deserves judicial deference.
B.
Having concluded that section 5’s “current burdens” are indeed justified by “current needs,” we proceed to the second Northwest Austin inquiry: whether the record supports the requisite “showing that a statute’s disparate geographic coverage is sufficiently related to the problem that it targets.” 129 S.Ct. at 2512. Recall that this requirement stems from the Court’s concern that “[t]he Act ... differentiates between the States, despite our historic tradition that all the States enjoy ‘equal sovereignty.’ ” Id. “The evil that § 5 is meant to address,” the Court observed, “may no longer be concentrated in the jurisdictions singled out [by section 4(b) ] for preclearance.” Id.
Before examining the record ourselves, we emphasize that the Act’s disparate geographic coverage — and its relation to the problem of voting discrimination' — depends not only on section 4(b)’s formula, but on the statute as a whole, including its mechanisms for bail-in and bailout. Bailout func *874 tions as an integral feature of section 4’s coverage scheme: jurisdictions are subject to section 5 only if (1) they are captured by section 4(b), and (2) they have not bailed out, meaning that they have failed to demonstrate a clean voting record as defined in section 4(a). See 42 U.S.C. §§ 1973b(a), 1973c(a). In addition, jurisdictions not captured by section 4(b) but which nonetheless have serious, recent records of voting discrimination, may be “bailed in”— i.e., subjected to section 5 preclearance— pursuant to section 3(c). See 42 U.S.C. § 1973a(c). Therefore, the question before us is whether the statute as a whole, not just the section 4(b) formula, ensures that jurisdictions subject to section 5 are those in which unconstitutional voting discrimination is concentrated.
The most concrete evidence comparing covered and non-covered jurisdictions in the legislative record comes from a study of section 2 cases published on Westlaw or Lexis between 1982 and 2004. Impact and Effectiveness 964-1124 (report by Ellen Katz et al.). Known as the Katz study, it reached two key findings suggesting that racial discrimination in voting remains “concentrated in the jurisdictions singled out for preclearance,” Nw. Austin, 129 S.Ct. at 2512. First, the study found that of the 114 published decisions resulting in outcomes favorable to minority plaintiffs, 64 originated in covered jurisdictions, while only 50 originated in non-covered jurisdictions. Thus, although covered jurisdictions account for less than 25 percent of the country’s population, they accounted for 56 percent of successful section 2 litigation since 1982. Impact and Effectiveness 974; see also H.R.Rep. No. 109-478, at 53. When the Katz data is adjusted to reflect these population differences (based on the Census Bureau’s 2004 population estimates, the most recent data then available to Congress), the rate of successful section 2 cases in covered jurisdictions (.94 per million residents) is nearly four times the rate in non-covered jurisdictions (.25 per million residents), as illustrated in the chart below. See Ellen Katz & The Voting Rights Initiative, VRI Database Master List (2006), http://sitemaker.umich.edu/ votingrights/files/masterlistxls; U.S. Dep’t of Justice, Section 5 Covered Jurisdictions, http://www.justiee.gov/crt/about/vot/sec_5/ covered.php (last visited May 9, 2012); U.S. Census Bureau, Annual Estimates of the Population for the United States and States, and for Puerto Rico: April 1, 2000 to July 1, 2004, available at http://www. census.gov/popest/data/historical/2000s/ vintage_2004/state.html (last visited May 9, 2012); U.S. Census Bureau, Annual Estimates of the Resident Population for Counties: April 1, 2000 to July 1, 2004, available at http://www.census.gov/popesV data/counties/totals/2004/CO-EST2004-01. html (last visited May 9, 2012); U.S. Census Bureau, Population Estimates: Minor Civil Divisions: 2000 to 2004, available at http://www.census.gov/popesVdata/cities/ totals/2004/SUB-EST2004-5.html (last visited May 9, 2012).
*875 [[Image here]]
Second, the study found higher success rates in covered jurisdictions than in non-covered jurisdictions. Specifically, 40.5 percent of published section 2 decisions in covered jurisdictions resulted in favorable outcomes for plaintiffs, compared to only 30 percent in non-covered jurisdictions. Impact and Effectiveness 974.
The difference between covered and non-covered jurisdictions becomes even more pronounced when unpublished section 2 decisions — primarily court-approved settlements — are taken into account. As the Katz study noted, published section 2 lawsuits “represent only a portion of the section 2 claims filed or decided since 1982” since many claims were settled or otherwise resolved without a published opinion. Id. at 974. According to data compiled by the National Commission on the Voting Rights Act and Justice Department historian Peyton McCrary, there have been at least 686 unpublished successful section 2 cases since 1982, amounting to a total of some 800 published and unpublished cases with favorable outcomes for minority voters. See Decl. of Dr. Peyton McCrary 13 (“McCrary Decl.”). Of these, approximately 81 percent were filed in covered jurisdictions. Id. When this data is broken down state-by-state, separately identifying covered and non-covered portions of partially covered states, the concentration of successful section 2 cases in the covered jurisdictions is striking. Of the eight states with the highest number of successful published and unpublished section 2 cases per million residents — Alabama, Mississippi, Arkansas, Texas, South Carolina, Georgia, and the covered portions of South Dakota and North Carolina — all but one are covered. See Supp. Decl. of Dr. Peyton McCrary 3-7; U.S. Dep’t of Justice, Section 5 Covered Jurisdictions, http://www.justice.gov/crt/about/ vot/sec_5/covered.php (last visited May 9, 2012); U.S. Census Bureau, Annual Estimates of the Population for the United States and States, and for Puerto Rico: April 1, 2000 to July 1, 2004, available at http://www.census.gov/popest/data/ historical/2000s/vintage_2004/state.html (last visited May 9, 2012); U.S. Census Bureau, Annual Estimates of the Resident Population for Counties: April 1, 2000 to July 1, 2004, available at http://www. census.gov/popest/data/counties/totals/ 2004/CO-EST2004-01.html (last visited *876 May 9, 2012); U.S. Census Bureau, Population Estimates: Minor Civil Divisions: 2000 to 2004, available at http://www. census.gov/popest/data/cities/totals/2004/ SUB-EST2004-5.html (last visited May 9, 2012). The only exception is Arkansas, which, though not captured by section 4(b), was subjected to partial preclearance pursuant to a 1990 federal court order, i.e., “bailed in.” See Jeffers v. Clinton, 740 F.Supp. 585, 601-02 (E.D.Ark.1990). Similarly, of the fourteen states with the highest number of successful published and unpublished section 2 cases per million residents — the eight listed above, plus Montana, Louisiana, New Mexico, Virginia, and the non-covered portions of South Dakota and North Carolina — eleven are either covered, including the seven states originally covered by the 1965 Act, or were bailed in for some period (Arkansas and New Mexico). See Travis Crum, Note, The Voting Rights Act’s Secret Weapon: Pocket Trigger Litigation and Dynamic Preclearance, 119 Yale L.J.1992, 2010 & nn.100-01 (2010) (discussing bail-in of Arkansas and New Mexico). This data is displayed in the chart on the following page.
*877 [[Image here]]
Shelby County objects to the use of unpublished section 2 data, pointing out that although Congress considered the National Commission’s analysis of unpublished cases in covered jurisdictions, the legislative record does not contain McCrary’s analysis of unpublished cases in non-covered jurisdictions. We agree that there are reasons to approach this data with caution: McCrary prepared his analysis after the 2006 reauthorization, and because his data regarding unpublished cases in non-covered jurisdictions was collected separately from the data on unpublished cases in covered jurisdictions, we cannot be certain that the data collection methods *878 were identical. That said, the Supreme Court has considered post-enactment evidence to find at least one law congruent and proportional, see Lane, 541 U.S. at 524-25 nn. 6-9 & 13, 124 S.Ct. 1978 (citing articles and cases published ten or more years after the Americans with Disabilities Act was enacted, as well as recent versions of statutes and regulations), and here a majority of the unpublished cases from non-covered jurisdictions (as well as all from covered jurisdictions) appears in the legislative record, see McCrary Decl. 10. Also, while the Katz data on published cases is necessarily underinclusive, see Impact and Effectiveness 974 (explaining that the published cases analyzed by the Katz study “represent only a portion” of all section 2 actions), Shelby County has identified no errors or inconsistencies in the data analyzed by McCrary. Indeed, McCrary points out that even if his methodology identified only half of the unpublished cases in non-covered jurisdictions, “there would still be S9S more settlements resolved favorably for minority voters in” covered jurisdictions. McCrary Decl. 11. For these reasons, although we would not rely solely on the combined published and unpublished data, we think it provides helpful additional evidence that corroborates the disparities in the level of discrimination between covered and non-covered jurisdictions revealed by the published data.
The section 2 data, moreover, does not tell the whole story. As explained above, Congress found that section 5, which operates only in covered jurisdictions, deters or blocks many discriminatory voting laws before they can ever take effect and become the target of section 2 litigation. “Section 5’s reach in preventing discrimination is broad. Its strength lies not only in the number of discriminatory voting changes it has thwarted, but can also be measured by the submissions that have been withdrawn from consideration, the submissions that have been altered by jurisdictions in order to comply with the [Voting Rights Act], or in the discriminatory voting changes that have never materialized.” H.R. Rep. No. 109-M78, at 36. Accordingly, if discrimination were evenly distributed throughout the nation, we would expect to see fewer successful section 2 cases in covered jurisdictions than in non-covered jurisdictions. See Continuing Need 26 (explaining that section 5 “makes the covered jurisdietion[s] much ‘cleaner’ than they would have been without Section 5 coverage”). Yet we see substantially more.
Shelby County makes two main arguments in response to this evidence. First, citing Katzenbach’s finding that the coverage formula was “rational in both practice and theory,” 383 U.S. at 330, 86 S.Ct. 803, it contends that section 4(b) is irrational because it relies on “decades-old data.” Appellant’s Br. 59. “It cannot be constitutional,” Shelby County insists, “to rely on decades-old voting data to establish current voting discrimination.” Id. In addition, the County claims that in 1965 Congress was concerned with “first-generation” barriers — tests and devices that denied access to the ballot — and crafted the coverage formula to capture states that erected such barriers and had low registration rates. But in 2006, although Congress was more concerned with “second-generation” barriers — vote dilution techniques that weaken “minority voting effectiveness”' — -it retained a coverage formula aimed at first-generation problems. Thus, Shelby County concludes, “[tjhere is a serious mismatch between the conduct targeted by Congress and the factors that trigger coverage under Section 4(b).” Id. at 60.
This argument rests on a misunderstanding of the coverage formula. As the district court explained, the election years that serve as coverage “triggers” under *879 section 4(b) “were never selected because of something special that occurred in those years.” Shelby Cnty., 811 F.Supp.2d at 505. Instead, Congress identified the jurisdictions it sought to cover — those for which it had “evidence of actual voting discrimination,” Katzenbach, 383 U.S. at 329, 86 S.Ct. 803 — and then worked backward, reverse-engineering a formula to cover those jurisdictions. See id. (explaining that “Congress began work with reliable evidence of actual voting discrimination in a great majority of the States and political subdivisions affected by the new remedies of the Act” and that it “eventually evolved” a formula “to describe these areas”). The coverage formula relied on tests and devices “because of their long history as a tool for perpetrating the evil,” and voting rates because “widespread disenfranchisement must inevitably affect the number of actual voters.” Id. at 330, 86 S.Ct. 803. In other words, Congress chose the section 4(b) criteria not because tests, devices, and low participation rates were all it sought to target, but because they served as accurate proxies for pernicious racial discrimination in voting. The question, then, is not whether the formula relies on old data or techniques, but instead whether it, together with bail-in and bailout, continues to identify the jurisdictions with the worst problems. If it does, then even though the formula rests on decades-old factors, the statute is rational in theory because its “disparate geographic coverage” remains “sufficiently related to the problem that it targets.” Nw. Austin, 129 S.Ct. at 2512.
Of course, Shelby County’s real argument is that the statute fails this test, i.e., that it no longer actually identifies the jurisdictions “uniquely interfering with the right Congress is seeking to protect through preclearance.” Appellant’s Br. 62. The County points out that Congress never made a finding that racial discrimination in voting was “concentrated in the jurisdictions singled out for preclearance.” Nw. Austin, 129 S.Ct. at 2512. The County also argues that the Katz study is at best inconclusive, for some non-covered states, such as Illinois and the non-covered portions of New York, had more successful published section 2 lawsuits than did several covered states. In any event, it claims, “aggregated statistics showing slightly more Section 2 litigation with ‘favorable outcomes’ in covered jurisdictions as a group is not a rational basis for subjecting individually-targeted States to another 25 years of preclearance.” Appellant’s Br. 70.
Shelby County’s first point — that Congress failed to make a finding — is easily answered. Congress did not have to. United States v. Lopez, 514 U.S. 549, 562, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (Congress “normally is not required to make formal findings” in order to legislate). The proper question is whether the record contains sufficient evidence to demonstrate that the formula continues to target jurisdictions with the most serious problems. See Nw. Austin, 129 S.Ct. at 2512. This presents a close question. The record on this issue is less robust than the evidence of continued discrimination, see supra Part III.A, although this is in part due to the difficulty of comparing jurisdictions that have been subject to two very different enforcement regimes, i.e., covered jurisdictions are subject to both sections 2 and 5 while non-covered jurisdictions are subject only to section 2. And although the Katz data in the aggregate does suggest that discrimination is concentrated in covered jurisdictions, just three covered states — Alabama, Louisiana, and Mississippi — account for much of the disparity. The covered states in the middle of the pack- — North Carolina, South Carolina, Virginia, Texas, and Georgia — are about on par with the worst non-covered *880 jurisdictions. And some covered states— Alaska and Arizona — had no successful published section 2 cases at all.
As explained above, however, this data presents an incomplete picture of covered jurisdictions. When we consider the Katz data in conjunction with other record evidence, the picture looks quite different. For instance, although Georgia had only three successful published section 2 cases between 1982 and 2004, during that time the state had 66 successful unpublished section 2 cases, 83 section 5 objections, and 17 successful section 5 enforcement actions. Evidence of Continued Need 250-51, 272. In addition, between 1990 and 2005, jurisdictions in Georgia withdrew 90 proposed voting changes in response to MIRs. Id. at 2566. South Carolina is similar. Although the state had only 3 successful published section 2 cases, it had 30 successful unpublished section 2 cases, 74 section 5 objections, and 10 successful section 5 enforcement actions, as well as 26 voting changes withdrawn in response to MIRs and 51 changes that could not lawfully be implemented for failure to respond to MIRs. Id. at 250-51, 272, 2566. South Carolina, moreover, is one of the covered states that not only has continued racial disparities in voter registration and turnout, but that has never elected an African American to statewide office. See supra p. 862. Accordingly, even if only a relatively small portion of objections, withdrawn voting changes, and successful section 5 enforcement actions correspond to unconstitutional conduct, and even if there are substantially more successful unpublished section 2 cases in non-covered jurisdictions than the McCrary data reveals, these middle-range covered jurisdictions appear to be engaged in much more unconstitutional discrimination compared to non-covered jurisdictions than the Katz data alone suggests. In fact, the discrepancy between covered and non-covered jurisdictions is likely even greater given that, as Congress found, the mere existence of section 5 deters unconstitutional behavior in the covered jurisdictions. That is, the middle-range covered states appear comparable to some non-covered jurisdictions only because section 5’s deterrent and blocking effect screens out discriminatory laws before section 2 litigation becomes necessary. Had section 5 not been in effect, one would expect significantly more discrimination in North Carolina, South Carolina, Virginia, Texas, and Georgia, all covered by section 5, than in the non-covered states with the worst records. See S.Rep. No. 109-295, at 11 (suggesting that “without the Voting Rights Act’s deterrent effect,” the evidence of discrimination in the covered jurisdictions “might be considerably worse”).
To be sure, the coverage formula’s fit is not perfect. But the fit was hardly perfect in 1965. Accordingly, Katzenbach’s discussion of this issue offers a helpful guide for our current inquiry, particularly when we consider all probative record evidence of recent discrimination — and not just the small subset of section 2 cases relied upon by the dissent, see Dissenting Op. at 898-99. In 1965, the formula covered three states in “which federal courts ha[d] repeatedly found substantial voting discrimination” — Alabama, Louisiana, and Mississippi, Katzenbach, 383 U.S. at 329, 86 S.Ct. 803, the same three states that, notwithstanding more than forty years of section 5 enforcement, still account for the highest rates of published successful section 2 litigation, as well as large numbers of unpublished successful section 2 cases, section 5 objections, federal observer coverages, and voting changes withdrawn or modified in response to MIRs. But the 1965 formula also “embrace[d] two other States — Georgia and South Carolina — plus large portions of a third State — North Carolina— for which there was more fragmentary evidence of recent voting discrimination mainly adduced by the Justice Department *881 and the Civil Rights Commission.” Id. at 329-30, 86 S.Ct. 803. Today, the middle-range covered jurisdictions — North Carolina, South Carolina, Virginia, Texas, and Georgia — look similar: although the legislative record contains fewer judicial findings of racial discrimination in these states, it contains at least fragmentary evidence, in part based on Attorney General objections, that these states continue to engage in unconstitutional racial discrimination in voting. Finally, the 1965 formula swept in several other jurisdictions — including Alaska, Virginia, and counties in Arizona, Hawaii, and Idaho — for which Congress apparently had no evidence of actual voting discrimination. See id. at 318, 329-30, 86 S.Ct. 803. Today, the Act likewise encompasses jurisdictions for which there is some evidence of continued discrimination — Arizona and the covered counties of California, Florida, and New York, see Evidence of Continued Need 250-51, 272 — as well as jurisdictions for which there appears little or no evidence of current problems — Alaska and a few towns in Michigan and New Hampshire.
Critically, moreover, and as noted above, in determining whether section 5 is “sufficiently related to the problem that it targets,” we look not just at the section 4(b) formula, but at the statute as a whole, including its provisions for bail-in and bailout. Bail-in allows jurisdictions not captured by section 4’s coverage formula, but which nonetheless discriminate in voting, to be subjected to section 5 preclearance. Thus, two non-covered states with high numbers of successful published and unpublished section 2 cases — Arkansas and New Mexico — were subjected to partial preclearance under the bail-in provision. See Jeffers, 740 F.Supp. at 601-02; Crum, 119 Yale L.J. at 2010 & n.101 (citing Sanchez v. Anaya, No. 82-0067M, slip op. at 8 (D.N.M. Dec. 17, 1984)). Federal courts have also bailed in jurisdictions in several states, including Los Angeles County, California; Escambia County, Florida; Thurston County, Nebraska; Bernalillo County, New Mexico; Buffalo County, South Dakota; Charles Mix County, South Dakota; and the city of Chattanooga, Tennessee. See Crum, 119 Yale L.J. at 2010 & nn.10208.
Bailout plays an even more important role in ensuring that section 5 covers only those jurisdictions with the worst records of racial discrimination in voting. As the Supreme Court explained in City of Boeme, the availability of bailout “reducéis] the possibility of overbreadth” and helps “ensure Congress’ means are proportionate to [its] ends.” 521 U.S. at 533, 117 S.Ct. 2157; see also Katzenbach, 383 U.S. at 329, 86 S.Ct. 803 (“Acknowledging the possibility of overbreadth, the Act provides for termination of special statutory coverage at the behest of States and political subdivisions in which the danger of substantial voting discrimination has not materialized during the preceding five years.”). As of May 9, 2012, having demonstrated that they no longer discriminate in voting, 136 jurisdictions and sub-jurisdictions had bailed out, including 30 counties, 79 towns and cities, 21 school boards, and 6 utility or sanitary districts. U.S. Dep’t of Justice, Section 4 of the Voting Rights Act, http://www.justice.gov/crt/ about/vot/misc/sec_4.php# bailout_list (last visited May 9, 2012) (“DOJ Bailout List”). In fact, by ruling in Northwest Austin that any jurisdiction covered by section 5 could seek bailout — a development unmentioned by the dissent — the Supreme Court increased significantly the extent to which bailout helps “ensure Congress’ means are proportionate to [its] ends,” Boerne, 521 U.S. at 533, 117 S.Ct. 2157. See Nw. Austin, 129 S.Ct. at 2516 (holding that “all political subdivisions — not only those described in § 14(c)(2) — are eligible to file a bailout suit”). Not surprisingly, then, the *882 pace of bailout increased after Northwest Austin: of the successful bailout actions since 1965, 30 percent occurred in the three years after the Supreme Court issued its decision in 2009. See DOJ Bailout List, http://www.justice.gov/crt/about/vot/ misc/sec_4.php# bailoutJist. Also, the Attorney General “has a number of active bailout investigations, encompassing more than 100 jurisdictions and subjurisdictions from a range of States.” Br. for Att’y Gen. as Appellee at 47-48, LaRoque v. Holder, 679 F.3d 905 (D.C.Cir.2012).
The importance of this significantly liberalized bailout mechanism cannot be overstated. Underlying the debate over the continued need for section 5 is a judgment about when covered jurisdictions— many with very bad historic records of racial discrimination in voting — have changed enough so that case-by-case section 2 litigation is adequate to protect the right to vote. Bailout embodies Congress’s judgment on this question: jurisdictions originally covered because of their histories of discrimination can escape section 5 preclearance by demonstrating a clean record on voting rights for ten years in a row. See 42 U.S.C. § 1973b(a)(l) (bailout criteria). As the House Report states, “covered status has been and continues to be within the control of the jurisdiction such that those jurisdictions that have a genuinely clean record and want to terminate coverage have the ability to do so.” H.R.Rep. No. 109-478, at 25. Bailout thus helps to ensure that section 5 is “sufficiently related to the problem that it targets,” Nw. Austin, 129 S.Ct. at 2512.
Shelby County complains that bailout helps only “at the margins,” Appellant’s Br. 53; see also Dissenting Op. at 901, and the dissent emphasizes that only about 1 percent of covered jurisdictions and subjurisdictions have applied for bailout, Dissenting Op. at 901. But absent evidence that there are “clean” jurisdictions that would like to bail out but cannot meet the standards, the low bailout rate tells us nothing about the effectiveness of the bailout provision. See Shelby Cnty., 811 F.Supp.2d at 500-01 (describing “several plausible explanations for th[e] failure to seek bailout,” including “the minimal administrative cost associated with preclearance, and the fact that covered jurisdictions see no need to avoid the preclearance requirement”). As the dissent concedes, since 1982 no bailout application has been denied, Dissenting Op. at 900-01, and Congress considered evidence that the bailout criteria “are easily proven for jurisdictions that do not discriminate in their voting practices.” Voting Rights Act: An Examination of the Scope and Criteria for Coverage Under the Special Provisions of the Act: Hearing Before the Subcomm. on the Constitution of the H. Comm, on the Judiciary, 109th Cong. 90 (2005). The dissent speculates that “opaque standards” may prevent bailouts, Dissenting Op. at 900-01, but neither it nor Shelby County specifically challenges Congress’s definition of what constitutes a clean jurisdiction or how the Attorney General is applying the bailout criteria. In fact, as noted above, Shelby County never even tried to bail out and has brought only a facial challenge. If something about the bailout criteria themselves or how the Attorney General is applying them is preventing jurisdictions with clean records from escaping section 5 preclearance, those criteria can be challenged in a separate action brought by any adversely affected jurisdiction. See United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (explaining that in a facial challenge, “[t]he fact that [a law] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid”).
*883 This, then, brings us to the critical question: Is the statute’s “disparate geographic coverage ... sufficiently related to the problem that it targets”? Nw. Austin, 129 S.Ct. at 2512. Of course, if the statute produced “a remarkably bad fit,” Dissenting Op. at 898-99, then we would agree that it is no longer congruent and proportional. But as explained above, although the section 4(b) formula relies on old data, the legislative record shows that it, together with the statute’s provisions for bail-in and bailout — hardly “tack[ed] on,” id. at 901 (internal quotation marks omitted), but rather an integral part of the coverage mechanism — continues to single out the jurisdictions in which discrimination is concentrated. Given this, and given the fundamental principle that we may not “strik[e] down an Act of Congress except upon a clear showing of unconstitutionality,” Salazar v. Buono, — U.S. -, 130 S.Ct. 1803, 1820, 176 L.Ed.2d 634 (2010) (plurality opinion), we see no principled basis for setting aside the district court’s conclusion that section 5 is “sufficiently related to the problem that it targets,” Nw. Austin, 129 S.Ct. at 2512.
C.
We turn, finally, to the dissent’s argument that section 5 “requires a jurisdiction not only to engage in some level of race-conscious decisionmaking, but also on occasion to sacrifice principles aimed at depoliticizing redistricting.” Dissenting Op. at 886; see also Nw. Austin, 129 S.Ct. at 2512 (explaining that “federalism concerns are underscored by the argument that ... ‘considerations of race that would doom a redistricting plan under the Fourteenth Amendment or § 2 seem to be what save it under § 5’ ” and that “[additional constitutional concerns are raised in saying that this tension between §§ 2 and 5 must persist in covered jurisdictions and not elsewhere” (quoting Georgia v. Ashcroft, 539 U.S. at 491, 123 S.Ct. 2498 (Kennedy, J., concurring))). According to the dissent, this concern and the burden imposed by section 5 are aggravated by the amendments to section 5 Congress added in conjunction with the 2006 reauthorization. Dissenting Op. at 886-88; see also 2006 Act § 5.
The dissent’s thoughtful arguments face a serious obstacle. Shelby County neither challenges the constitutionality of the 2006 amendments or even argues that they increase section 5’s burdens, nor does it argue that section 5 requires covered jurisdictions to undertake impermissible considerations of race. These issues, in other words, are entirely unbriefed, and as we have repeatedly made clear, “appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.” Carducci v. Regan, 714 F.2d 171, 177 (D.C.Cir.1983). Where, as here, “counsel has made no attempt to address the issue, we will not remedy the defect, especially where, as here, important questions of far-reaching significance are involved.” Id. (internal quotation marks omitted).
Even were they not forfeited, the dissent’s concerns would not have satisfied the standards for mounting a facial constitutional challenge. Such a challenge, the Supreme Court has made clear, is “the most difficult ... to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.” Salerno, 481 U.S. at 745, 107 S.Ct. 2095. Yet the amendments, as well as the Supreme Court’s concern that section 5 may sometimes require otherwise impermissible race-conscious decisionmaking, are implicated only in a subset of cases. Specifically, the amendment overturning Bossier II is implicated only in cases involving a discrimi *884 natory but non-retrogressive purpose, see 42 U.S.C. § 1973c(c); the amendments overturning Georgia v. Ashcroft, like the Supreme Court’s concern about race-conscious decisionmaking, are implicated primarily in redistricting cases where section 5 seems to require consideration of race as a “ ‘predominant factor.’ ” See Nw. Austin, 129 S.Ct. at 2512 (quoting Georgia v. Ashcroft, 539 U.S. at 491, 123 S.Ct. 2498 (Kennedy, J., concurring)); 42 U.S.C. §' 1973c(b), (d). In other words, even assuming the dissent is correct, it would not have established that “no set of circumstances exists under which the Act would be valid,” Salerno, 481 U.S. at 745, 107 S.Ct. 2095. Indeed, addressing the dissent’s arguments would lead us into the very kind of “speculation” and “anticipation]” of constitutional questions that require courts to “disfavor[]” facial challenges. Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 450, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (internal quotation marks omitted).
IV.
In Northwest Austin, the Supreme Court signaled that the extraordinary federalism costs imposed by section 5 raise substantial constitutional concerns. As a lower federal court urged to strike this duly enacted law of Congress, we must proceed with great caution, bound as we are by Supreme Court precedent and confined as we must be to resolve only the precise legal question before us: Does the severe remedy of preelearance remain “congruent and proportional”? The legislative record is by no means unambiguous. But Congress drew reasonable conclusions from the extensive evidence it gathered and acted pursuant to the Fourteenth and Fifteenth Amendments, which entrust Congress with ensuring that the right to vote — surely among the most important guarantees of political liberty in the Constitution — is not abridged on account of race. In this context, we owe much deference to the considered judgment of the People’s elected representatives. We affirm.

So ordered.